**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>OPENAI, INC.,<br>COPYRIGHT INFRINGEMENT LITIGATION<br><br>This document relates to:<br><br>Case No. 1:23-cv-08292-SHS-OTW<br>Case No. 1:23-cv-10211-SHS-OTW | 25-md-3143 (SHS) (OTW)<br><br>Hon. Sidney H. Stein<br>Hon. Ona T. Wang<br><br>REDACTED—PUBLIC VERSION |

**CLASS PLAINTIFFS' COUNTERSTATEMENT OF MATERIAL FACTS IN OPPOSITION TO OPENAI'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York, David Baldacci, Taylor Branch, Michael Connelly, Sylvia Day, Jonathan Franzen, Christopher Golden, Andrew Sean Greer, John Grisham, David Henry Hwang, Matthew Klam, George R.R. Martin, Jodi Picoult, Stacy Schiff, James Shapiro, The Authors Guild, Belfry Holdings, Inc., Columbus Rose, Ltd., Daring Greatly Corporation, Gattopardo, LLC, Hieronymus, Inc., Sylvia Day LLC, and Wo & Shade LLC (collectively, "Class Plaintiffs") respectfully submit this counterstatement of material facts in opposition to OpenAI Defendants' ("OpenAI") Motion for Summary Judgment.

## A. OpenAI's Awareness of Memorization and Library Genesis

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**B. Defendants Understood Their Models Could Replace Authors**

[redacted]

[redacted]

[redacted]

**C. Class Plaintiffs Were Willing to License Their Works for AI Training**

18. Every Class Plaintiff that was asked in their deposition testified that they would be willing to license their works for generative AI training.

19. David Baldacci agreed that he would consider licensing his works for "AI training" if someone approached him about it. Nelson Decl. Ex. 920 at 210:19–211:6.

20. Sylvia Day testified that if asked to license her works for training a large language model, she would "absolutely present [the offer] to [her] team and negotiate" and her "primary goal is to monetize [her] work in every way possible." Nelson Decl. Ex. 919 at 157:16–24.

21. John Grisham agreed that he would be "willing to sit down with an artificial intelligence company and license [his] asserted works for training AI models." Nelson Decl. Ex. 925 at 182:16–22.

22. Taylor Branch testified that he would consider an offer to "licens[e] [his] books for use" as AI training data. Nelson Decl. Ex. 921 at 110:4-7.

23. Stacy Schiff testified that she would be "willing to discuss licensing" her works for AI training. Nelson Decl. Ex. 928 at 195:14-196:2.

24. Michael Connelly, Christopher Golden, Andrew Sean Greer, George R.R. Martin, Jodi Picoult, and James Shapiro gave comparable testimony. Nelson Decl. Ex. 922 at 156:17–25; Nelson Decl. Ex. 923 at 89:19–90:7; Nelson Decl. Ex. 924 at 112:17–22; Nelson Decl. Ex. 926 at 140:13–141:3, 141:24–142:5, 151:24–152:10, 153:1–3; Nelson Decl. Ex. 927 at 77:7-22. *See also* Lasinski Decl. Ex. B at ¶ 238 (analyzing authors' willingness to participate in the licensing market, including an Authors Guild survey finding that 95 percent of writers think they should be compensated for use of their works in developing generative AI).

**D. OpenAI's Conduct Has Harmed Class Plaintiffs and the Marketplace for Books**

25. Similarly, numerous Class Plaintiffs confirmed in their depositions that they view OpenAI's products as a threat to their livelihoods.

26. In his deposition, David Baldacci stated: "outputs that they can put together will compete against my work." Nelson Decl. Ex. 920 at 221:20–25.

27. Mr. Baldacci added: "With my recent publication of 'Nash Falls,' there were a couple of AI books that were published the same day that were summaries of my books that offered, you know, a summary of David Baldacci's 'Nash Falls' that you can read in lieu of my book. It was selling for a lower price." Nelson Decl. Ex. 920 at 227:7–12.

28. In his deposition, Taylor Branch testified: "AI can generate automatically without involvement of any human being an artificial product that draws on my copyrighted material without a license and offer it to anybody to slap their names on it and sell it and thereby displace the market for me." Nelson Decl. Ex. 921 at 126:13–19.

29. Sylvia Day similarly testified: "And I am harmed any time somebody produces a book in my style because of that machine. … I know the machine has ingested my work. I know that it has my style and my technique within it. And I am aware that the reason why it's in that machine is so that it can copy and reproduce my work." Nelson Decl. Ex. 919 at 145:13–21.

30. Ms. Day added: "I believe that the flooding of the market of AI-generated books, again, is creating an unnatural level of competition that will eventually have the possibility of making human creative writing an unsustainable career." Nelson Decl. Ex. 919 at 148:19–23.

31. In his deposition, Christopher Golden stated: "I see it on social media every day. Other authors talking about various books, writers talking about how, I've done seven books this week and, you know, they've sold this many copies, all using AI. So, essentially, what's happening is that authors like me have had their materials stolen and fed into the LLM and using, you know, our stories, our styles, our ideas, the -- you know, the AI is producing, potentially long-term, millions of competitive works that are, in my opinion, lesser. But, more importantly, you know, generated from stolen work and competing with the victims of that theft. I see it every single day. I see -- I saw references to a particular romance publisher and romance authors saying that they're

losing their contracts because the romance publisher is actually engaging in publishing books in this manner." Nelson Decl. Ex. 931 at 42:19–43:14.

32. In his deposition, Andrew Greer testified: "This is a substitution for buying and reading my book." Nelson Decl. Ex. 924 at 134:25–135:01.

33. John Grisham testified: "there is a very real risk that we could be eliminated or seriously damaged by the flood of cheap books, legal thrillers." Nelson Decl. Ex. at 175:9–11.

34. George R.R. Martin testified: "As AI gets better and better and better, which I do think it will, you don't need the writers so much." Nelson Decl. Ex. 926 at 101:13–15.

35. Mr. Martin added: "Or alternatively if it's really good, then they think, Well, I don't need to buy the George Martin edition." Nelson Decl. Ex. 926 at 214:16–18.

36. In her deposition, when asked "[d]o you believe that ChatGPT is an existing threat to your livelihood as an author because it can replace your work," Stacy Schiff confirmed "Yes." Nelson Decl. Ex. 928 at 43:19–22.

37. In his deposition, Michael Connelly stated: "it took my books and now it can make my stories available through not the – my contracted license way of doing -- delivering my books to readers." Nelson Decl. Ex. 922 at 77:2–5.

38. Mr. Connelly added: "And the part about it still being a threat, it still means that -- you know, what I'm saying is they're not going to replace writers, but it could put them out of business if, you know, if copyrights are not respected." Nelson Decl. Ex. 922 at 156:10–14.

39. In his deposition, James Shapiro testified: "I believe that AI will do and is doing harm to me as an author by making available my words and ideas and style and discoveries that are hard-earned and for which I paid, when necessary, to cover copyrighted materials. So I believe

that it won't replace me as a writer, but I believe that it harms and will harm my ability to write and sell books." Nelson Decl. Ex. 955 at 67:13–20.

40. This harm is further reflected in the marketplace for books. As Class Plaintiffs' expert Mark Seeley explained: "The notion that authors would acquiesce to Defendants' infringement in exchange for the perceived benefits of AI is inconsistent with real world evidence. Public reporting reveals that authors are sounding the alarm about AI-generated works that imitate their works." Seeley Decl. Ex. B ¶ 35.

41. Among others, Mr. Seeley noted:

> A 2024 report from National Public Radio noted concerns raised by the author Kara Swisher about unauthorized purported biographies, and the sociology author Marie Arana who found that a recent book of hers had been mimicked (but using a slightly different title and listing another author).
>
> Author Leland Vittert discovered that "[s]everal AI deepfakes" of his recent "bestselling book 'Born Lucky'" have "been sold on Amazon, leading some to accidentally purchase the books without realizing they are not authored by" Vittert.
>
> Broadcast journalist Savannah Guthrie "notic[ed] fake books being advertised as companion workbooks to her book" 39 and author Lisa Sun "spotted fake workbooks in the suggested books field right under her legitimate book's Amazon listing page."
>
> Author Jane Friedman, who has written three books, "found six more bearing her name on Amazon last summer." 41 According to Friedman, these fake books were "likely AI-generated"—their availability "coincided with the explosion of AI writing tools, and it was exactly the kind of generic, vague, not very good writing that I would expect."
>
> Journalist Catherine Tsalikis discovered a book on Amazon that imitated both the cover and text of her own work. 43 Tsalikis "concluded it was written by artificial intelligence," describing the text as "a weird mirror image, like a refracted image of words . . . . The sentiment is the same, but the words are different."
>
> Author Jessica Waite found "an AI fake on Amazon" that "ripped off the title, cover and content" of her book. 45 Additionally, Waite discovered "a fake prequel under [Waite's] name, linked to Waite's author profile on Amazon."

*Id.*

42. Class Plaintiffs' expert Ben Zhao similarly explained: "One of the major concrete harms of LLMs is the massive proliferation of what is now commonly called AI slop, i.e., automated content that has little meaning other than being low qualify mimics of human created content. … Similar trends were quickly found on more commercial platforms like Amazon, where the vibrant book market was flooded with unlabeled, low quality AI-books that were turning away customers who could not immediately identify which were human written books without first paying for the purchase." Zhao Decl. Ex. B ¶¶ 134–135.

43. Dr. Zhao added: "Beyond just outputting an overwhelming volume of AI slop, it is clear that LLMs were used by bad actors to target and take away profits from individual authors by replicating, imitating, or summarizing human written books and trying to displace them on the marketplace. Unfortunately, without significant changes by AI model trainers, this wave of AI slop is unlikely to stop any time soon." *Id.* at ¶ 135.

44. Class Plaintiffs' expert Michael Lasinski explained the economic mechanisms through which this marketplace harm operates: "The harm to authors operates through at least two concurrent market mechanisms. The first is volume-driven: the entry of a large quantity of new, competing content directly into the marketplace where Plaintiffs' works are sold. The second is quality-driven: to the extent that the introduction of AI-generated content meets or exceeds consumer acceptance levels, those works can more directly compete with Plaintiffs' works, thereby introducing a level of competition that did not exist before." Lasinski Decl. Ex. B ¶ 411.

45. As to the volume-driven mechanism, Mr. Lasinski explained that "[t]he evidence provided by the 2026 Reimers and Waldfogel study demonstrates that there has been a significant increase in the supply of books in the market, driven specifically by the proliferation of AI-generated content," and that this "[redacted]

[redacted]." Lasinski Decl. Ex. B ¶ 410.

46. Mr. Lasinski explained that the same study "provides informative evidence of these harms," including "[d]irect evidence . . . that AI-containing books have lower quality, and their rising share . . . drives the overall decline" in average book quality, and that "works can be created using AI quickly at lower cost and have lower prices than human-created works, on average," such that "[a]s the quality of AI-generated books increases, so does the likelihood of pricing pressure relative to the copyrighted books." *Id.* ¶¶ 411–412.

47. Mr. Lasinski also identified survey evidence that authors are already experiencing this harm, explaining that "[r]esearch from the University of Cambridge in November 2025 found that 39 percent of novelists reported their income had already been negatively affected by GenAI, with 85 percent expecting their future income to be similarly affected," a figure that "aligns closely with an ITW survey of authors, which found that approximately 76 percent expect AI to negatively impact author incomes over the next 10 years." *Id.* ¶ 396.

48. Mr. Lasinski also discussed accounts of displacement reported by authors outside this litigation. He noted that author Jess Michaels told *The New York Times*: "The glut of the A.I. work makes discoverability very difficult . . . . You're talking about directly pirating my work, putting it into an engine so that you can produce a 'Jess Michaels-type book,' and then glutting the market with it. I cannot tell you how soul-crushing it is . . . . It essentially erases actual authors." Mr. Lasinski further noted that, according to *The New York Times*, sales of Ms. Michaels's books "have been so dismal that she might stop publishing." Lasinski Decl. Ex. D ¶ 6 & n.16.

49. Mr. Lasinski similarly noted that best-selling author Tim Ferriss reported that his agent, "who has decades of statements to compare against, put it bluntly: 2025 was the first big

drop, 2026 looks more severe, and the only thing that's really changed in that timeframe is the acceleration of AI." Lasinski Decl. Ex. C at n.227.

[redacted]

51. In an order denying Motion for Leave to Appeal in *Kadrey et al v. Meta Platforms*, 3:23-cv-03417-VC, ECF No. 767, Judge Chhabria wrote: "The motion for leave to file an interlocutory appeal is denied. To be sure, the issue presented in the motion is a difficult one, and Judge Alsup's opinion makes a good point. But it won't be long before a final judgment is entered in at least one of the Meta cases before this Court. That judgment will allow the issue presented in the current motion, along with many other important issues relating to the use of copyrighted materials in the training of AI models, to be presented to the Court of Appeals as part of a tidy package." Nelson Decl. Ex. 880.

**E. An Emerging and Growing Licensing Market Exists for Books for LLM Training**

52. As Class Plaintiffs' expert Michael Lasinski explained in his reports, the "factual record in this matter supports the existence of an emerging and growing licensing market for acquiring access and use rights to copyrighted bools for LLM training and/or output." Lasinski Decl. Ex. B ¶ 48.

53. First, as Mr. Lasinski explained, "a range of entities, including AI content aggregators, intermediaries, and trade groups, along with platforms, have emerged to secure rights to real-world content and facilitate transactions involving licensing and use of such data." *Id.* ¶ 59.

54. [redacted] *Id.* at ¶ 103.

55. Second, "the record supports that books generally, as a category (and not limited to academic books), provide unique and highly valuable characteristics important for LLM training, operation, and performance." *Id.* at ¶ 346–347; *see also* Zhao Decl. Ex. A ¶¶ 14–72.

56. Third, "the book market is well-versed in structuring agreements that grant licensing rights for specific uses of copyrighted works and in compensating rights holders for these uses." *Id.* at ¶ 42–43.

**F. OpenAI's Internal Understanding of Compression, Piracy, and Safety Risks**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Dated: October 23, 2026

*<u>/s/ Justin A. Nelson</u>*
Justin A. Nelson
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: 713.651.9366
jnelson@susmangodfrey.com
***Interim Lead Counsel for Class Plaintiffs***

**CERTIFICATE OF SERVICE**

I hereby certify that on October 23, 2026, I caused the foregoing document to be electronically filed with the Clerk of the United States District Court for the Southern District of New York using the CM/ECF system, which shall send electronic notification to all counsel of record.

*/s/ Tyler Alabanza-Behard*
Tyler Alabanza-Behard